# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

TYRONE McMILLIAN
    Petitioner-defendant,

  v.                              Case No. 16-C-487
                                   (Criminal Case No. 11-CR-281)

UNITED STATES OF AMERICA,
    Respondent-plaintiff.

## DECISION AND ORDER

The government charged petitioner Tyrone McMillian with possessing firearms and ammunition as a felon, contrary to 18 U.S.C. § 922(g)(1). Petitioner moved to suppress the contraband, but the court denied his motion. He proceeded to a stipulated bench trial, was found guilty, and then sentenced to 77 months in prison. The Seventh Circuit affirmed on direct appeal. United States v. McMillian, 786 F.3d 630 (7th Cir. 2015).

In this collateral attack under 28 U.S.C. § 2255, petitioner argues that his trial lawyers provided ineffective assistance by failing to properly argue the suppression motion and in advising him to have a bench trial rather than pursuing a conditional guilty plea in order to preserve his right to appeal. On review of the submissions and the record, I conclude that petitioner's trial lawyers overlooked meritorious arguments for suppression and accordingly grant his § 2255 motion on this ground.[1] I need not address the plea/court trial issue.

---

[1] Petitioner was represented by three different lawyers from the Boyle law firm at the district court level: Bridget Boyle-Saxton filed the motions and appeared at the evidentiary hearing before the magistrate judge; Gerald Boyle filed objections to the magistrate judge's report and recommendation; and K. Richard Wells appeared at the additional evidentiary hearing before the district judge. As all of these lawyers overlooked the meritorious arguments,

## I. FACTS AND BACKGROUND

### A. Underlying Criminal Case

On July 6, 2011, Milwaukee Police Officer Brian Shull reviewed a "suspect card," an internal document issued by the Milwaukee Police Department, which asserted probable cause to arrest petitioner for his alleged involvement in an October 2007 double homicide. McMillian, 786 F.3d at 633. Specifically, the card indicated that petitioner "was an associate and former business partner of victim#1: Jetannue C. Clayborne"; petitioner "admitted fighting with Clayborne a week prior to the homicide regarding the recording studio"; petitioner "admitted to Todd Carter that he was responsible for the shooting and killing of both Clayborne and victim #2: Yolanda R. Brown"; and "Carter admitted to being a long time friend of [petitioner] and a former business partner." (Case No. 16-C-487, R. 20-1.) The card provided no explanation as to when or how this information came to the attention of the police, nor did it contain any corroboration of Carter's statements or otherwise vouch for his reliability.

Shull went to petitioner's home in Brown Deer, Wisconsin to arrest him, summoning officers from the Milwaukee Police Department's tactical enforcement unit, as well as Brown Deer officers, to assist. In total, six or seven additional officers arrived at petitioner's house at approximately 1:00 pm. They did not have an arrest or search warrant. McMillian, 786 F.3d at 633.

The other officers surrounded the house, while Shull knocked and announced that he was a police officer. Ashley Knueppel, petitioner's cohabiting girlfriend, came to the door and confirmed that petitioner was inside. After she stepped outside, Shull called for petitioner to

---

I simply refer to "counsel" in this decision.

2

come. When petitioner came to the door, Shull arrested him. Id. Shull later testified that petitioner was inside the house at the time of the arrest (Case No. 11-CR-193, R. 145 at 57), while petitioner and Knueppel said that he was outside (id. at 19-20, 79). After the arrest, tactical officers conducted a protective sweep of the house, observing a rifle case in one of the bedrooms. McMillian, 786 F.3d at 633.

As the sweep was taking place, Shull noticed that petitioner was barefoot and asked if he wanted shoes; petitioner responded that he wanted his black Air Jordan Nike flip flops. Shull asked if he wanted the black flip flops that were near the doorway, but petitioner responded that those were Knueppel's and his were in the back bedroom. Id.

After the protective sweep concluded, Shull asked Knueppel if she knew where the flip flops were located, and Knueppel responded affirmatively; one of them said something like, "Let's go get them." Id. at 633-34. The two then proceeded to the back bedroom, and as Shull bent to pick up the footwear he saw two gun cases. Id. at 634.

The police subsequently applied for and obtained a warrant to search petitioner's residence. The affidavit averred that police arrested petitioner pursuant to an arrest warrant (Case No. 11-CR-193, R. 28-1 at 3 ¶ 5), but that was incorrect; the police had only a "suspect card." The affidavit further averred that officers observed an assault rifle during the protective sweep (id. at 4 ¶ 6), but that too was incorrect; the officers observed a rifle case. The affidavit also referenced the gun cases Shull observed when he retrieved the flip flops. (See id. at 4 ¶ 6.) Finally, the affidavit described Carter's statement that petitioner had confessed involvement in two 2007 homicides. (Id. at 3 ¶ 4.) On searching the house, officers recovered the firearms and ammunition forming the basis for this prosecution. McMillian, 786 F.3d at

3

634.²

Petitioner filed motions to suppress, arguing that the protective sweep was unlawful, and that the warrant was invalid because, inter alia, it contained false statements.³ (Case No. 11-CR-193, R. 27 & 28.) In briefing (id., R. 42), petitioner further argued that neither he nor Knueppel voluntarily consented to Shull's entry, and that the uncorroborated statement of the informant accusing petitioner of involvement in the 2007 double homicide did not supply probable cause. See McMillian, 786 F.3d at 634-35. In its response to the motions, the government conceded that the protective sweep was unlawful, as petitioner was the only suspect in the homicide and the officers had no reason to believe others might be present in the house and pose a danger to them during the arrest (Case No. 11-CR-193, R. 30 at 3-4), and further agreed to strike the description of the rifle from the search warrant affidavit (id. at 9-10). Nevertheless, the government argued, the warrant affidavit established probable cause based on Shull's observation of the gun cases in the bedroom. (Id. at 11.)

Magistrate Judge Nancy Joseph held an evidentiary hearing on the motions, then issued a report and recommendation, agreeing that the protective sweep was unlawful but concluding that Shull's entry into the back bedroom was lawful because petitioner voluntarily consented.⁴

---

²The government also indicted petitioner on sex trafficking charges, but none of the materials seized from the house were used in that prosecution. Id. at 634 n.2. Nevertheless, the motion litigation occurred in the sex trafficking case, No. 11-CR-193, assigned to Judge Clevert. Judge Randa presided over the underlying criminal case here, and he agreed that Judge Clevert's suppression rulings would be dispositive in the firearms case. Id. at 634.

³He also argued that the warrant was deficient because a detective improperly corrected an error in the address. Both the district and appellate courts rejected that argument, and petitioner does not now allege counsel mishandled it so I do not address the issue further.

⁴She rejected the government's argument, made in the post-hearing briefing (Case No. 11-CR–193, R. 43 at 12), that Shull's entry was permitted under the "clothing exception." (Id.,

4

She further found that there was no probable cause to search for evidence of the 2007 homicides, but that there was probable cause to search for firearms. McMillian, 786 F.3d at 634-35.

Petitioner objected, arguing that he did not consent to the entry, and that absent Shull's observations when he retrieved the shoes the warrant could not stand. (Case No. 11-CR-193, R. 56.) For its part, the government objected to the magistrate judge's recommendation that the "clothing exception" did not apply to Shull's retrieval of the footwear, and that the warrant affidavit did not establish probable cause for the homicide offenses. (Id., R. 48 at 3.) The government further asked the district judge to find that Knueppel was authorized to and did give Shull implied consent to get the shoes. (Id. at 4.)

District Judge Clevert held an additional evidentiary hearing, then issued an oral ruling agreeing with Judge Joseph that the warrant affidavit contained insufficient detail to support a search for evidence of homicide, but that petitioner and Knueppel gave implied consent to enter the home and fetch the shoes (id., R. 145 at 99-103) and that the officers otherwise acted in good faith (id. at 111-12). He accordingly denied petitioner's motion to quash the search warrant. McMillian, 786 F.3d at 635.

Pursuant to the parties' agreement, Judge Randa accepted Judge Clevert's ruling, and the parties proceeded to a stipulated bench trial. Judge Randa found petitioner guilty and sentenced him to 77 months imprisonment, id., consecutive to the sentence in the sex trafficking case. (Case No. 11-CR-281, R. 22.)[5]

---

R. 46 at 11-12.)

[5]Judge Clevert initially imposed a sentence of 30 years in the sex trafficking case, but on remand he reduced it to 15 years. (Case No. 11-CR-193, R. 172.)

5

On direct appeal, represented by different counsel, petitioner attempted to argue that the police unlawfully arrested him inside his house, but the Seventh Circuit found that he forfeited the argument by failing to raise it in the district court. McMillian, 786 F.3d at 635-36. He also attempted to argue that consent to Shull's entry into the back bedroom was tainted by the prior unlawful arrest and by the prior unlawful protective sweep, but the court of appeals found he had also forfeited this argument. Id. at 637-38. Finally, the court agreed that the observations from the protective sweep were properly stricken from the affidavit, and that the informant's tip did not establish probable cause to search for evidence of the homicides. However, the court also agreed with Judge Joseph's finding that there was probable cause to search for firearms based on Shull's observation of gun cases when he entered the home, with consent, to fetch the shoes. Id. at 639.

**B.     2255 Action**

In his initial, pro se § 2255 motion, petitioner argued (1) that the police unlawfully arrested him inside his home without an arrest warrant; (2) that his lawyers provided ineffective assistance by failing to raise the issue of the unlawful arrest; and (3) that his lawyers provided ineffective assistance in advising him to have a stipulated bench trial rather than pursuing a conditional guilty plea. After I appointed counsel, petitioner filed a supplemental brief, in which he conceded that the first claim, raising a stand-alone challenge to the arrest, was defaulted. Petitioner pressed the remaining contentions and also sought to add a related claim, that counsel was ineffective in failing to challenge probable cause for his arrest. (Case No. 16-C-487, R. 20 at 3.)

In its supplemental response, the government argued that petitioner's unlawful arrest claim failed because he and Knueppel testified that he was arrested outside the house, that

6

the known tipster's information provided probable cause for the arrest, and that trial counsel did raise the tainted consent issue. (Id., R. 24 at 2-3.) On the plea issue, the government presented an affidavit from one of petitioner's trial lawyers averring that the issue of a conditional plea was raised with petitioner, but he refused to plead guilty "because he did not trust the government." (Id., R. 24-1 at 2.)

In reply, petitioner argued that the court could grant the § 2255 motion on the ineffective assistance/suppression issue based on the testimony received and findings made in the underlying case. However, if the court found it necessary to reach the plea/court trial issue, an evidentiary hearing would be needed, as the record now contained conflicting evidence as to whether counsel offered the advice referenced in the affidavit. (Id., R. 26.) I subsequently held a status conference, at which the parties confirmed that the issues were fully briefed and ready for decision, but that an evidentiary hearing would be needed on the plea claim if the court reached it. (Id., R. 31.)

## II. DISCUSSION

### A. Ineffective Assistance Standards

In order to demonstrate ineffective assistance of counsel, a defendant must show that his lawyer's performance was objectively deficient, and that this deficient performance prejudiced the defense. Shell v. United States, 448 F.3d 951, 954 (7th Cir. 2006) (citing Strickland v. Washington, 466 U.S. 668, 688-94 (1984)). When the claim of ineffective assistance is based on counsel's failure to litigate a motion to suppress, the defendant must prove the motion was meritorious. United States v. Ciesloski, 410 F.3d 353, 360 (7th Cir. 2005) (citing Owens v. United States, 387 F.3d 607, 610 (7th Cir. 2004); United States v. Stewart, 388

F.3d 1079, 1084 (7th Cir. 2004)). "Such a showing would speak to both prongs of the ineffectiveness claim: it would demonstrate that the failure to file a motion to suppress was objectively unreasonable; and it would supply partial proof of prejudice, by establishing that the a suppression motion would have removed [the challenged evidence] from the [government's] case." Gilbert v. Merchant, 488 F.3d 780, 790-91 (7th Cir. 2007). Ultimately, the defendant must show that there is a reasonable probability that the verdict would have been different absent the excludable evidence. Johnson v. Thurmer, 624 F.3d 786, 792 (7th Cir. 2010).

**B. Analysis**

Counsel provided ineffective assistance by failing to challenge the manner of and justification for petitioner's arrest. Both of these arguments would have been meritorious, and the record suggests no strategic reason why counsel did not raise them, in place of or in the alternative to the theories counsel did pursue. Shull's observation of the gun cases, which supported the search warrant pursuant to which police recovered the contraband, flowed directly from the unlawful arrest, and the consent to his entry was tainted thereby. Finally, with the firearms and ammunition suppressed, there is a reasonable probability that the result of the trial would have been different.

    **1. Petitioner's Arrest**

        **a. Manner of Arrest**

Because the Fourth Amendment has drawn a firm line at the entrance to the house, absent exigent circumstances, that threshold may not reasonably be crossed without a warrant. Kirk v. Louisiana, 536 U.S. 635, 637 (2002) (per curiam) (citing Payton v. New York, 445 U.S. 573, 590 (1980)). The police may arrest without a warrant a person standing in the open

8

doorway to his home (assuming probable cause). See United States v. Santana, 427 U.S. 38 (1976). This is so because a person standing in the threshold of his dwelling is in a "public" place, not in an area where he has any expectation of privacy. Id. at 42. Courts have further upheld arrests where the police go to a person's home without a warrant, knock on the door, announce from outside the home the person is under arrest when he opens the door to answer, and the person acquiesces to the arrest. United States v. Berkowitz, 927 F.2d 1376, 1386 (7th Cir. 1991) (collecting cases).

On the other hand, the police may not, absent exigent circumstances, enter a person's home to effectuate an arrest before telling the person he is under arrest. Id. at 1386-87. The Berkowitz court explained why that is so:

> That warrantless entry before arrest is not legal (and, conversely, that a slight entry after the defendant has submitted to the police is legal) can be seen from analyzing the privacy interests involved in the situation. The Fourth Amendment protects people's legitimate expectations of privacy. A person's subjective privacy expectation in any situation is legitimate, and therefore worthy of Fourth Amendment protection, if it is one that society is prepared to recognize as reasonable.
>
> As the Court noted in Payton, there is no place where a person's expectation of privacy is greater than in his own home. A person does not abandon this privacy interest in his home by opening his door from within to answer a knock. Answering a knock at the door is not an invitation to come in the house. We think society would recognize a person's right to choose to close his door on and exclude people he does not want within his home. This right to exclude is one of the most—if not the most—important components of a person's privacy expectation in his home.
>
> When the police assert from outside the home their authority to arrest a person, they have not breached the person's privacy interest in the home. If the person recognizes and submits to that authority, the arrestee, in effect, has forfeited the privacy of his home to a certain extent. At that point, it is not unreasonable for the police to enter the home to the extent necessary to complete the arrest. A person who has submitted to the police's authority and stands waiting for the police to take him away can hardly complain when the police enter his home briefly to complete the arrest. . . .

9

> It is a different matter, however, for the police to enter a person's home, without his consent, before announcing their authority to arrest. In that case, the arrestee has not forfeited his privacy interest in the home; he has not relinquished his right to close the door on the unwanted visitors. Indeed, the police have not even given him a chance to exercise that right.

Id. at 1386-87 (internal citations and quote marks omitted).

Courts have further held that the police may not evade this rule by surrounding a suspect's home with a show of force and ordering him to exit, then arresting him. See, e.g., United States v. Saari, 272 F.3d 804, 809-10 (6th Cir. 2001). Under these circumstances, courts consider the seizure to have occurred inside the home. See, e.g., Sharrar v. Felsing, 128 F.3d 810, 819-20 (3d Cir. 1997).

In this case, police, including members of the department's tactical squad, surrounded petitioner's home. After Knueppel answered the door, officers escorted her outside, then yelled for petitioner to come. When petitioner came to the door, Officer Shull placed him in handcuffs and removed him from the house. The record contains strong evidence, known to counsel, that this arrest occurred inside the home.

The warrant affidavit stated that police "gained entry into the residence and arrested [petitioner] in the residence." (Case No. 11-CR-193, R. 28-1 at 4 ¶ 6.) At the hearing before Judge Joseph, Shull said petitioner "was inside the threshold, the frame of the door." (Case No. 11-CR-193, R. 41 at 10:1.) In her statement of facts, Judge Joseph indicated: "While McMillian was inside the frame of the doorway, Officer Shull handcuffed him and placed him into custody." (Case No. 11-CR-193, R. 46 at 3.) Later, in assessing the protective sweep, she referenced the standard for arrests "in a home" (id. at 9), and in assessing the voluntariness of the consent referred to the coercive nature of an "in-home arrest" (id. at 17). At the hearing before Judge Clevert, Shull explicitly testified that petitioner was arrested "[i]nside the house"

10

and never stepped out of the house before he was arrested. (Case No. 01-CR-193, R. 145 at 57:3-7.) On cross-examination, Shull confirmed that he was "certain" he made the arrest inside the house. (Id. at 63:16-18.) Further, Shull did not testify that he announced petitioner was under arrest, while standing outside the house, before crossing the threshold to make the arrest. See Flores v. Lackage, 938 F. Supp. 2d 759, 770-71 (N.D. Ill. 2013) (finding arrest unlawful where suspect answered the door in response to officer's knock and officer reached into the home to seize him).

Trial counsel did not in the original motion seek suppression based on the manner of the arrest under Payton and its progeny, despite the explicit statement in the warrant affidavit. Nor did counsel seek to expand the argument for suppression based on Shull's testimony that he entered the house to make the arrest. Counsel did challenge the protective sweep following the arrest, but nothing prevented them from also challenging the arrest itself.

In its response, the government indicates that, while the testimony before the magistrate judge pointed to a threshold arrest, at the supplemental hearing before Judge Clevert petitioner and Knueppel took the stand and testified that petitioner stepped outside and closed the door before he was arrested.[6] The government argues that, because of this testimony, counsel could not have made the claim petitioner now pursues. (R. 24 at 21.)

The government cites no authority in support of this argument, i.e., that trial counsel was somehow estopped from arguing, even in the alternative, that the arrest occurred inside the house, or that petitioner is now estopped from making this claim given his and Knueppel's prior testimony. Judicial estoppel applies only when the party to be estopped previously convinced

---

[6]Petitioner did not testify at the hearing before Judge Joseph; Knueppel did, but she did not clearly address the issue of the location of the arrest.

11

the court to adopt its position. E.g., United States v. Hook, 195 F.3d 299, 306 (7th Cir. 1999). Here, neither Judge Joseph nor Judge Clevert accepted the testimony the government cites. While she was not required to definitively resolve the issue, Judge Joseph indicated that the arrest occurred inside the house. (Case No. 11-CR-193, R. 46 at 3, 9, 17.) Judge Clevert adopted her findings, furthering stating that "Knueppel was not totally candid during her testimony." (Id., R. 145 at 100:23-24.)[7]

The record suggests no strategic reason why, given the clear statements from law enforcement that the arrest occurred inside the home, counsel would at the supplemental hearing have pressed the theory (via testimony or argument) that the arrest happened outside.[8] In any event, nothing prevented counsel from arguing in the alternative. See Mathews v. United States, 485 U.S. 58, 63-65 (1988) (noting that defendants may raise inconsistent defenses).[9]

The government concludes that this argument is a bit of a red herring, since no fruits flowed from the arrest, e.g., the discovery of contraband on petitioner's person or a post-arrest confession. (Case No. 16-C-487, R. 24 at 21-22.) However, this ignores the fact that the

---

[7]Neither side has indicated that I should hold an evidentiary hearing to definitively decide where the arrest took place in order to decide this claim of ineffective assistance. I express no opinion on whether any further proceedings should occur after the underlying case is re-opened.

[8]To the extent counsel may have thought arrest outside the home bolstered the challenge to the protective sweep inside the house, the government had already conceded the sweep was unlawful.

[9]Counsel also had a basis for arguing that, even if petitioner did exit the home before the arrest, he was coerced into doing so by the officers' show of force. See Saari, 272 F.3d at 809-10; Sharrar, 128 F.3d at 819-20. However, I need not rely on this theory in finding ineffective assistance.

12

police discovered the firearms and ammunition as a direct result of the arrest. Had Shull not arrested petitioner in the doorway, barefoot, there would have been no reason to enter the house to fetch shoes, affording Shull the opportunity to see the gun cases. See United States v. Ienco, 92 F.3d 564, 568 (7th Cir. 1996) ("[I]f the arrest was illegal, evidence obtained by the discovery of the key hidden by the arrested persons in the police car and the ensuing discovery, impoundment, and search of the van would be inadmissible, all that being a fruit of the unlawful arrest."). That observation alone saved the search warrant pursuant to which the contraband was seized. See McMillian, 786 F.3d at 639. Further, the legality of the arrest also bears directly on the validity of the consent to enter the house to fetch the shoes, as will be discussed below.

### b. Justification for Arrest

Even if the police had arrested petitioner outside his home, that arrest would be lawful only if supported by probable cause.[10] See United States v. Sawyer, 224 F.3d 675, 678 (7th Cir. 2000) ("An officer may legally arrest a suspect without obtaining an arrest warrant beforehand only if the officer has probable cause to believe the suspect has committed a crime and the suspect is not inside his or her home."). "A law enforcement officer has probable cause to make an arrest when the facts and circumstances within the officer's knowledge and of which the officer has reasonably trustworthy information are sufficient to warrant a prudent person in believing the suspect has committed or is committing an offense." Id. at 678-79.

---

[10]Petitioner did not in his original pro se motion specifically raise a claim that counsel provided ineffective assistance in failing to challenge probable cause for the arrest. However, this claim clearly "relates back" to the claim challenging the manner of the arrest, as both arise out of a common core of operative facts. See Mayle v. Felix, 545 U.S. 644, 664 (2005); Fed. R. Civ. P. 15(c). The government does not argue the contrary or otherwise oppose amendment to add this claim. I accordingly consider it.

13

As indicated above, Shull arrested petitioner for his alleged participation in a 2007 double homicide based on the information contained in the "suspect card," which essentially alleged that petitioner admitted to someone named Todd Carter that he was responsible for the shootings. The card provides no details about this alleged confession, contains no corroboration of Carter's statements, and makes no claims about Carter's reliability.

At the hearing before Judge Joseph, Shull testified that after he reviewed the card he did "a workup or a background on" petitioner (Case No. 11-CR-193, R. 41 at 5:17), but it appears this consisted merely of biographical information, confirming where petitioner lived. There is no indication in the record that Shull gained further information linking petitioner to the 2007 homicides. The search warrant affidavit includes a few more details, including Carter's date of birth, an indication that Carter "personally obtained information from his friend and suspect [petitioner]", and that petitioner "confessed the argument was over a failed lease contract, which involved a recording studio." (Case No. 11-CR-193, R. 28-1 at 3 ¶ 4.) However, the affidavit also contains no corroboration of Carter's statements or information about his reliability.

> As the Seventh Circuit noted in deciding the direct appeal:
>
> The magistrate and district judges were also correct to conclude that the informant's tip did not establish probable cause to search for evidence of the homicides. The affidavit does not indicate that the police independently corroborated the informant's allegations, nor does it include any information concerning the informant's credibility and reliability. Thus, there was no probable cause to search for evidence of the homicides. See Illinois v. Gates, 462 U.S. 213, 241 (1983) ("Our decisions applying the totality-of-the-circumstances analysis . . . have consistently recognized the value of corroboration of details of an informant's tip by independent police work.").

McMillian, 786 F.3d at 639.

Despite these findings, the government argues that the police did have probable cause

to arrest petitioner for the homicides. However, the government fails to explain why the Seventh Circuit's finding, quoted above, does not constitute the "law of the case." See Fuller v. United States, 398 F.3d 644, 648 (7th Cir. 2005) ("In the context of § 2255 petitions, the law of the case doctrine dictates that once this court has decided the merits of a ground of appeal, that decision establishes the law of the case and is binding on a [court] asked to decide the same issue in a later phase of the same case, unless there is some good reason for reexamining it.") (internal quote marks omitted).

In any event, the government's arguments lack merit. The government first notes the tip came from a known informant rather than an anonymous one. (Case No. 16-C-487, R. 24 at 22.) That an informant is named does not mean his statements are automatically worthy of credence. See United States v. Koerth, 312 F.3d 862, 868 (7th Cir. 2002) (finding no probable cause based on conclusory statement of named informant of unknown reliability); see also United States v. Bell, 585 F.3d 1045, 1050 (7th Cir. 2009) (finding no probable cause where affidavit included no information about informant's track record or the nature of his relationship with the suspect).[11]

The government further argues that, unlike in Koerth, where the tip was used to support a search warrant, here the tip was used to support an arrest. (Case No. 16-C-487, R. 24 at 23.) However, the government cites no authority suggesting that weaker evidence will suffice to support an arrest. See United States v. Navarro, 90 F.3d 1245, 1254 (7th Cir. 1996) (stating that a "warrantless arrest, like a warrantless search, must be supported by probable cause" and

---

[11]As petitioner indicates in reply, the card does not describe Carter as a disinterested citizen witness, whose statements might generally be deemed reliable. (Case No. 16-C-487, R. 26 at 8.)

that courts "assess the determination of probable cause for a search or an arrest under the common-sense 'totality of the circumstances' Gates analysis").

While conceding that "reasonable minds can differ" on this issue, the government again argues that any deficiency in counsel's performance on this point did not prejudice petitioner because no evidence flowed from his arrest. (Case No. 16-C-487, R. 24 at 23.) As indicated above, the arrest led directly to Shull's entry and observation of the gun cases, which in turn supported the warrant; further, the legality of the arrest bears directly on the consent issue.

Finally, the record suggests no strategic reason why counsel could not have challenged the arrest on this basis. Even if, as the government contends, counsel was precluded from claiming the arrest occurred inside the home, nothing prevented the argument that an arrest outside the home was not supported by probable cause.

### 2. Tainted Consent

As indicated, the search warrant was ultimately sustained based on Shull's observations when he entered the home (with consent) to fetch petitioner's shoes. Trial counsel argued that Shull lacked consent to enter but did not argue that any consent was tainted by the previous unlawful arrest. Petitioner attempted to raise a taint argument on direct appeal, but the Seventh Circuit found it forfeited. McMillian, 786 F.3d at 637 n.5. This argument, too, was meritorious and should have been raised by trial counsel.

"Consent given during an illegal detention is presumptively invalid." United States v. Cellitti, 387 F.3d 618, 622 (7th Cir. 2004). "A consent to search following an illegal seizure is valid only if the evidence uncovered during the consent search has been come upon 'by means sufficiently distinguishable to be purged of the primary taint.'" United States v. Jerez, 108 F.3d 684, 694 (7th Cir. 1997) (quoting Brown v. Illinois, 422 U.S. 590, 599 (1975)). In assessing

16

whether the taint of an illegal seizure dissipated before consent was given, the court considers the time that elapsed between the illegal act and the subsequent acquisition of evidence, the presence of intervening factors, and the purpose and flagrancy of the official misconduct. Brown, 422 U.S. at 603-04; Jerez, 108 F.3d at 694-95. "When consent to search is given by a person who remains illegally detained, the government is unlikely to meet its burden of showing that the consent was sufficiently attenuated from the illegality." Cellitti, 387 F.3d at 623.

At the time consent was obtained in this case,[12] the police had removed Knueppel from the house and detained her outside,[13] and handcuffed and arrested petitioner. Their home had been surrounded by six or seven officers, including members of a tactical team in paramilitary attire, who then proceeded to conduct an illegal protective sweep of the home. While this sweep was ongoing, as he stood barefoot and handcuffed outside the home, petitioner provided implied consent for Shull to retrieve his shoes. Importantly, petitioner required footwear only because he had been illegally arrested and removed from his home, without warning, when he came to the door. Similarly, Knueppel had been detained at the time she

---

[12] Judge Joseph found that petitioner consented, while Judge Clevert concluded that petitioner and Knueppel consented. McMillian, 786 F.3d at 635. I accordingly address the circumstances under both were detained.

[13] At the hearing before Judge Clevert, Shull testified:
Q. Now, when Miss Knueppel came out of the house was she allowed to roam around freely?
A. No.
Q. Would she have been allowed to roam around freely?
A. No. There [would] have been an officer standing by with her.
Q. Possibly holding on to her.
A. Holding on, doubtful; standing with her, yes.
(Case No. 11-CR-193, R. 145 at 56.)

17

spoke to Shull about getting the shoes, and Shull testified that he would not have let her go into the house by herself to get them. (Case No. 11-CR-193, R. 145 at 62.)

The record reveals that very little time elapsed between the illegal arrest and the provision of consent; Shull estimated that he spoke to petitioner about the shoes about five minutes after the arrest. (Id. at 64:8-9.) Moreover, the illegal protective sweep was ongoing at the time petitioner and Shull spoke about the shoes. See United States v. Barone, 721 F. Supp. 2d 261, 280 (S.D.N.Y. 2010) (finding no attenuation where suspect provided consent during 15-minute conversation while other officers conducted an ongoing search). Shull testified that he waited for the sweep to be done before he spoke to Knueppel about the flip flops, but that took no more than 10 minutes. (Case No. 11-CR-193, R. 145 at 65.) During this time, petitioner was held in the back of a squad car on the scene. (Id. at 65.)

The record reveals the presence of no intervening circumstances, such as movement to a different location or consultation with counsel or friends. See, e.g., United States v. Conrad, 673 F.3d 728, 734 (7th Cir. 2012). Further, the police conducted this encounter in an intimidating manner, surrounding the house wearing paramilitary attire, removing Knueppel from the house and detaining her outside, demanding petitioner come to the door, arresting him inside the doorway, and then conducting an illegal protective sweep of the home. In sum, it seems unlikely the government could have established attenuation under these circumstances. Indeed, the government makes no attempt to do so now. Finally, the record reveals no strategic reason why counsel could not have argued both that no consent was given and that, even if it was, it was tainted (particularly given the magistrate judge's finding that consent was merely implied).

In its response, the government contends that counsel did argue tainted consent, and

18

that the magistrate and district judges considered the argument. (Case No. 16-C-487, R. 24 at 23-24.) The Seventh Circuit disagreed, see McMillian, 786 F.3d at 637 n.5, and the government again provides no basis for me to disregard the law of the case, see Fuller, 398 F.3d at 648. In any event, as the portion of Judge Joseph's recommendation the government cites makes clear, the issue raised and considered at the district court level pertained to the coercive impact of petitioner's "in-home arrest" on his ability to voluntarily consent. (Case No. 16-C-487, R. 24 at 24; Case No. 11-CR-193, R. 46 at 17.) There was no discussion of attenuation under Brown and its progeny.

### 3. Counsel's Efforts Overall

The government urges me to consider the totality of counsel's performance, which suggested an energetic and at times successful effort to defend petitioner. The government notes that counsel persuaded the court that the protective sweep was illegal, that the "clothing exception" did not apply, and that the warrant lacked probable cause to search for evidence of the 2007 homicides. (Case No. 16-C-487, R. 24 at 20.) However, none of these arguments resulted in the suppression of any evidence in this case.[14]

In any event, while the court should in considering an ineffective assistance claim evaluate the entire course of the defense, the Supreme Court has recognized that even a single error during an otherwise vigorous defense may suffice if that error is sufficiently egregious and prejudicial. Williams v. Lemmon, 557 F.3d 534, 538 (7th Cir. 2009) (citing Murray v. Carrier, 477 U.S. 478, 496 (1986)). I have considered the manner in which counsel litigated the suppression issues in the present case, and it is clear that counsel overlooked

---

[14] The government's suggestion that these efforts helped petitioner avoid murder charges is speculative and beyond the scope of these proceedings.

clearly superior arguments. This is not a matter of second guessing counsel's decisions with the benefit of hindsight, as the government contends (Case No. 16-C-487, R. 24 at 25), but rather the application of clearly established law to the facts known by counsel at the time.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that petitioner's § 2255 motion (R. 1) as supplemented/amended (R. 20) is granted, and the judgment in Case No. 11-CR-281 is vacated and that case reopened. The Clerk shall enter judgment accordingly in this case.

Dated at Milwaukee, Wisconsin, this 30th day of March, 2020.

                                          s/ Lynn Adelman
                                          LYNN ADELMAN
                                          District Judge